UNITED STATES of America,
Plaintiff,

v.

DIXIE GRAIN COMPANY, Inc., a
corporation, Defendant.

No. 1365.

United States District Court
E. D. Tennessee,
Winchester Division.

Sept. 27, 1965.

J. H. Reddy, U. S. Atty., Chattanooga, Tenn., Charles J. Gearhiser, Asst. U. S. Atty., Chattanooga, Tenn., of counsel, for plaintiff.

Bobo, Tarpley & Kingree, Shelbyville, Tenn., Bayard Tarpley, Shelbyville, Tenn., of counsel, for defendant.

NEESE, District Judge.

This is a criminal action in which the information [1] filed on January 16, 1965 charges the defendant corporation in eight counts with permitting or requiring its drivers to remain on duty in excess of 70 hours during a period of eight consecutive days, in alleged violation of 49 C.F.R. 195.3(b). The penalty for each such violation, these constituting first offenses, is a fine of not less than $100 and not more than $500. 49 U.S.C. § 322(a). The defendant pleaded not guilty to each said offense.

---

1. The information was not signed by the United States Attorney for this District; but, as counsel for the defendant have not raised this issue but have appeared in open court in this matter and have joined the prosecuting attorney in submitting the issues for a decision by the Court on stipulated facts and briefs, the Court assumes its consideration of this inadvertence may be properly pretermitted.

The prosecution and defense attorneys approved an agreed order of April 21, 1965, wherein the defendant specifically waived trial by jury and stipulated that this Court might decide the action on a stipulation of facts filed on April 28, 1965.

The stipulated facts are:

## STIPULATION OF FACT

### – I –

Dixie Grain Company, Inc., is a Tennessee corporation with principal offices situated at 403 Depot Street, Shelbyville, Tennessee. It has been charged by an Information, consisting of eight counts, with violations of Part 2 of the Interstate Commerce Act in that it permitted or required drivers to remain on duty in excess of seventy hours during a period of eight consecutive days, in violation of 49 CFR 195.3(b).

### – II –

Counts 3 and 4 of the Information cover an overlapping period with respect the same driver, James H. Whitmore. Count 3 charges a violation of the above mentioned regulation of the Interstate Commerce Commission for a period of eight consecutive days beginning at 12:01 A.M. on April 24, 1964, and Count 4 of the Information covers the same driver for a period of eight consecutive days beginning at 12:01 April 28, 1964.

### – III –

The same situation applies to Counts 5 and 7 in that they cover to some extent an overlapping period on the same driver Sammie Dugan. Count 5 charges a violation of the above mentioned regulation covering this driver over a period of eight consecutive days beginning at 12:01 A.M. on June 2, 1964, and Count 7 charges the same violation for the same driver for a period of eight consecutive days beginning at 12:01 A.M. on June 5, 1964.

### – IV –

The defendant corporation is engaged primarily in the production of broilers for sale. It manufactures and processes its own feeds, owns and manages its on laying flocks, owns and operates its own hatchery for laying hens and broiler chicks, and contracts with various farmers essentially in the Middle Tennessee and North Alabama area for raising the broilers grown for production from baby chicks to the marketing period of the broilers.

As an incidental matter, Dixie Grain Company sells some of its feeds for resale at retail.

### – V –

The drivers involved in this Information are all employees of the division of the corporation which operates its hatchery.

### – VI –

Motor Carrier Safety Regulations published by Interstate Commerce Commission, including amendments as of December 31, 1957, provided in Section 195.3, Maximum on-duty time, as follows:

" § 195.3 Maximum on-duty time. No carrier subject to these regulations shall permit or require any driver employed or used by it to remain on duty, as defined in § 195.2 (a), for a total of more than 60 hours in any week, as defined in § 195.2(c): Provided, however, That carriers operating vehicles on every day of the week may permit drivers to remain on duty for a total of not more than 70 hours in any period of 192 consecutive hours: Provided further, however, That this section shall not apply with respect to drivers of motor vehicles controlled and operated by any farmer and used in the transportation of his agricultural commodities and products thereof, or in the transportation of supplies to his farm; nor shall it apply with respect to driver-salesmen employed by private carriers of property who devote more than 50 percent of their time to selling and less than 50 percent to such work as driving, loading, unloading, and the like: Provided further, however, That this section shall not apply with respect

to drivers of motor vehicles engaged solely in making deliveries for retail stores during the period from December 10 to December 25, both inclusive, of each year."

– VII –

The revised regulations eliminated the proviso underscored in the preceding section, and the present regulation with which the defendant is charged of having violated reads as follows:

"(b) Except as provided in paragraph (e) of this section, no motor carrier shall permit or require any driver used by it to be on-duty, nor shall any such driver be on-duty more than 60 hours in any 7 consecutive days as defined in § 195.2 (c), regardless of the number of motor carriers using the driver's services; Provided, however, That carriers operating vehicles every day in the week may permit drivers to remain on duty for a total of not more than 70 hours in any period of 8 consecutive days."

– VIII –

The defendant has entered a plea of not guilty to all counts in this information and respectfully insists that it is not guilty of violating the revised regulation referred to in the Information, and that said regulations are inapplicable to the drivers in question.

– IX –

Part 195—Hours of Service of Drivers, beginning with Section 195.1 through 195.3(b), reads as follows:

"§ 195.1 Compliance with and knowledge of regulations required. Every motor carrier and its officers, drivers, agents, employees, and representatives shall comply with the following regulations, and every motor carrier shall require that its officers, drivers, agents, employees, and representatives be conversant with this part.

"§ 195.2 Definitions—As used in this part, the following words and terms are construed to mean:

(a) On-duty time. All time from the time a driver begins to work or is required to be in readiness to work until the time he is relieved from work and all responsibility for performing work. The term 'On-duty time' shall include:

(1) All time at a carrier or shipper plant, terminal, facility, or other property, or on any public property, waiting to be dispatched, unless the driver has been relieved from duty by the motor carrier;

(2) All time inspecting equipment as required by sections 192.7 and 192.8 or otherwise inspecting, servicing, or conditioning any motor vehicle at any time;

(3) All driving time as defined in subparagraph (b) of this section;

(4) All time, other than driving time, in or upon any motor vehicle except time spent resting in a sleeper berth as defined in section 195.2(g);

(5) All time loading or unloading a vehicle, supervising, or assisting in the loading or unloading, attending a vehicle being loaded or unloaded, remaining in readiness to operate the vehicle, or in giving or receiving receipts for shipments loaded or unloaded;

(6) All time spent performing the driver requirements of sections 192.40 and 192.41 relating to accidents;

(7) All time repairing, obtaining assistance, or remaining in attendance upon a disabled vehicle; and

(8) Performing any other work in the capacity of, or in the employ or service of, a common, contract or private motor carrier.

(9) In the case of specially trained drivers of specially constructed oil well servicing vehicles, on duty time shall not include waiting time at a natural gas or oil well site, provided and all such time shall be fully and accurately accounted for in records to be maintained by the motor carrier. Such records shall be made

available upon request of this Commission.

(b) Driving time. The term 'drive' and 'driving time' shall include all time spent at the driving controls of a motor vehicle in operation. All stops made in any one village, town, or city, may be computed as one if the driver has not driven or operated the motor vehicle more than 10 miles in such village, town, or city.

(c) 7 Consecutive days. The term '7 consecutive days' means the period of 7 consecutive days beginning at 12:01 a.m. on any day.

(d) 8 consecutive days. The term '8 consecutive days' means the period of 8 consecutive days beginning at 12:01 a. m. on any day.

(e) 24 consecutive hours. The terms '24 consecutive hours' means any such periods starting at the time the driver reports for duty as defined in paragraph (a) of this section.

(f) Regularly employed driver. The term 'regularly employed driver' means a driver who in any period of 7 consecutive days is employed or used as a driver solely by a single motor carrier.

(g) Sleeper berth. The term 'sleeper berth' means a berth conforming to the requirements of section 193.76 of this subchapter.

"§ 195.3 Maximum driving and on-duty time.

(a) Except as provided in paragraphs (c) and (e) of this section and in § 195.10, no motor carrier shall permit or require any driver used by it to drive nor shall any such driver drive more than 10 hours following 8 consecutive hours off-duty or drive for any period after having been on duty 15 hours following 8 consecutive hours off-duty: Provided, however, That drivers using sleeper berth equipment, or off-duty at a natural gas or oil well location, may cumulate the afore-mentioned total of at least eight hours off-duty in two periods of at least two hours each, resting in a sleeper berth, as defined in § 195.2 (g), or resting while off-duty in other sleeping accommodations at a natural gas or oil well location.

(b) Except as provided in paragraph (e) of this section, no motor carrier shall permit or require any driver used by it to be on-duty, nor shall any such driver be on-duty more than 60 hours in any 7 consecutive days as defined in § 195.2(c), regardless of the number of motor carriers using the driver's services; Provided, however, That carriers operating vehicles every day in the week may permit drivers to remain on duty for a total of not more than 70 hours in any period of 8 consecutive days."

– X –

The persons designated as defendant's drivers in this Information are employed by defendant corporation in connection with the operation of its hatchery. Their duties consist of work within the hatchery itself, and they are called upon from time to time to make deliveries of defendant's baby chicks to defendant's broiler houses in preparation for grow-out of broilers. Customarily their duties have involved various usual duties in connection with the maintenance and operation of the hatchery itself without regard to any responsibility for delivery of baby chicks. Such deliveries as they were required to make consumed less than 50% of the time spent in their overall duties (even when their waiting time while making deliveries is considered as driving time within the provisions of the regulations).

An analysis of the daily logs upon which the eight counts of this Information are based discloses the following with respect the respective drivers involved:

Count No. 1: The driver in Count No. 1 made five deliveries during the eight-day period involved, requiring a total

of 36¼ hours. The maximum driving time, including stop-overs or any waiting periods on any one trip, was 9½ hours. The driver spent the remaining 54 hours of his on-duty time within the hatchery in connection with his other customary duties.

Count No. 2: The driver involved in this count made four deliveries during the eight-day period, which involved driving time of 31 hours. The remaining 55 hours of on-duty time were spent within the hatchery in connection with his customary duties.

Count No. 3: The driver in this count made five deliveries during the eight-day period which involved a total driving time of 33 hours. The remaining 61 hours of on-duty time were spent within the hatchery in connection with his customary duties.

Count No. 4: The driver involved in this count made five deliveries during the eight-day period in question involving 34¾ hours of driving time. The remaining 52 hours of his on-duty time for this period was spent in the hatchery in the performance of his customary duties.

Count No. 5: The driver in this count made three deliveries during the eight-day period in question involving a total of 26¼ hours driving time. The remaining 59¾ hours were spent in the performance of his customary duties in the hatchery.

Count No. 6: The driver involved in this count made three deliveries during the eight-day period which consumed 21¾ hours of driving time, and the remaining 59½ hours of on-duty time were spent in the performance of his customary duties at the hatchery.

Count No. 7: The driver in this count made three deliveries during the eight-day period which involved a total of 27¼ hours driving time. The remaining 64 hours of on-duty time were spent in the hatchery in the performance of his customary duties.

At no time did any of these drivers go out of the state without having eight or more hours off-duty time before coming to work.

Attached is a summary of the drivers involved in each count disclosing the number of trips, the destination of the driver, the total hours worked, and the total hours of driving time as disclosed by the daily logs upon which this information is based.*

– XI –

It is further stipulated that heretofore on at least three different occasions representatives of the Interstate Commerce Commission have investigated the operations of the defendant, Dixie Grain Company, Inc., to determine compliance with Motor Carriers Safety Regulations; that these investigations were performed on April 18, 1957, May 16, 1960, and June 5, 1962; that upon a trial of this cause the Government would offer to prove the investigations of 1960 and 1962 and to introduce in evidence investigations, copies of the investigator's reports which were delivered to the defendant corporation, and acknowledgment of receipts of said reports which are attached hereto as Exhibits "B" and "C";* that such evidence, if tendered by the Government, would be excepted to as incompetent, irrelevant and immaterial to this hearing.

It is further stipulated that the Government upon a trial of this case would attempt to introduce numerous letters directed to the defendant from the Interstate Commerce Commission on the following dates: March 7, 1941, November 23, 1954, September 17, 1956, October 17, 1956, April 22, 1957, and June 12, 1962. Copies of said letters are attached hereto and marked Exhibits "D," "E," "F," "G," "H," and "J," respectively.* The defendant, likewise, insists that such letters are immaterial and irrelevant to this hearing and would, accordingly, except to their introduction as evidence at the trial of this case. The Interstate Commerce Commission received letters

---

* The exhibits are omitted for purposes of publication.

from the defendant dated April 24, 1957, June 15, 1962, and August 17, 1964, said letters being attached hereto as Exhibits "I," "K," and "M," respectively.* There is also attached hereto as Exhibit "L" * a copy of the investigator's report of July 28, 1964, upon which this Criminal Information is apparently based, which was delivered to the defendant and receipt thereof acknowledged by it as disclosed by Exhibit "M" attached hereto.*

Accordingly, the defendant, although it has agreed to stipulate the tender of proof set out in this section of the stipulation, respectfully excepts to its consideration by the Court for the reason that it is irrelevant and immaterial and constitutes a tender of proof by the Government of prior similar offenses which are clearly inadmissible. They are further inadmissible in that the defendant has no opportunity to refute or to prove the circumstances surrounding any of the matters brought up in the prior investigations.

— XII —

It is further stipulated that upon the trial of this case the defendant would tender and offer to prove by its officers and officials that it has for many years considered all of its hatchery operations as a farming operation within the contemplation of federal law and had, likewise, considered its drivers within the hatchery to be exempt from the Interstate Commerce Regulations in question until it was examined on July 28, 1964, prior to this Information being returned. The Government insists that such a tender of proof is irrelevant and inadmissible, and it is stipulated that it would be excepted to on this basis by the Government. The Government's exception to such a tender of proof is preserved by this stipulation.

Respectfully submitted,
Bobo Tarpley & Kingree
Bayard Tarpley
Solicitors for Defendant
Charles J. Gearhiser
United States Attorney

The information charges the defendant with knowingly and willfully permitting and requiring drivers in its employ, named in the respective counts of the information, and operating motor vehicles in interstate commerce, to remain on duty for a total of more than 70 hours in a period of eight consecutive days, as follows, that

| in Count | its driver | in the period | worked | of which, there was interstate driving of |
|---|---|---|---|---|
| 1 | Whittemore | 2/4/64–2/11/64 | 86¼ hrs. | 24½ hrs. |
| 2 | Whittemore | 2/17/64–2/24/64 | 86 hrs. | 9¾ hrs. |
| 3 | Whittemore | 4/24/64–5/1/64 | 94 hrs. | 9 hrs. |
| 4 | Whittemore | 4/28/64–5/5/64 | 86¾ hrs. | 16¾ hrs. |
| 5 | Duggin | 6/2/64–6/9/64 | 86 hrs. | 16¼ hrs. |
| 6 | Hemphill | 6/3/64–6/10/64 | 80¾ hrs. | 16 hrs. |
| 7 | Duggin | 6/5/64–6/12/64 | 89 hrs. | 18 hrs. |
| 8 | Hemphill | 6/23/64–6/30/64 | 91¼ hrs. | 15¾ hrs. |

The defendant insists that its aforenamed drivers are not drivers within the contemplation of 49 C.F.R. 195.3(b).

The defendant was required by law to abide by the regulations promulgated by the Interstate Commerce Commission, 49 C.F.R. 195.3, at all times, in order that the safety of the operation of its trucks, driven by its aforenamed drivers, might be protected during those

* The exhibits are omitted for purposes of publication.

particular hours or days when, in the course of the duties of the aforenamed drivers, such drivers did the particular acts which directly affected the safety of the operation of such trucks. Levinson v. Spector Motor Service (1947), 330 U.S. 649, 67 S.Ct. 931, 91 L.Ed. 1158, 1174 (headnote 2).[2] Dissenting therein on another point, the late Mr. Justice Rutledge observed:

" * * * Ten minutes of driving by an unqualified driver may do more harm on the highway than a month or a year of constant driving by a qualified one.

\* \* \* \* \* \*

" * * * (I)n relation to some kinds of work, the [Interstate Commerce] Commission has power to prescribe the qualifications of all employees who engage in it to any extent, though the time thus spent is not five minutes daily or weekly. 'Substantial effect' in these instances has little if any relation, negatively speaking, to 'substantial time'. Driving and the work of mechanical repair of trucks are obvious examples.

" * * * (T)his means that all employees who do any part of certain kinds of work, * * * regularly or casually, fall within the Commission's power. It means, for instance, that a person who spends ten minutes a day or an hour a week in driving * * * and the remaining 39 hours of a 40-hour week in work having no effect upon safety falls within the Commission's authority. For, in such circumstances, it cannot be held that the comparatively minute amount of time spent in work affecting safety is trivial or inconsequential in its possible effects upon safety. And in the Court's view, as I understand it, the result is * * * that the Commission has power to prescribe the qualifications of all such employees * * *." Idem., 330 U.S.P. 685, 67 S.Ct. p. 950, 91 L.Ed. p. 1180.

Therefore, " * * * it is 'the character of the activities rather than the proportion of either the employee's time or of his activities that determines the actual need for the Commission's power to establish reasonable requirements with respect to * * * maximum hours of service.' * * * " Foremost Dairies v. Ivey, C.A. 5th (1953), 204 F.2d 186, 189 [6], citing and quoting from Morris v. McComb (1947), 332 U.S. 422, 431, 68 S.Ct. 131, 135, 92 L.Ed. 44, 53 (headnote 1). " * * * The factual question to be decided is not whether a substantial part of [an employee's] duties affected the safety of operation but, rather, whether any of [that employee's] duties had a substantial effect on motor vehicle safety. * * * While it is true that many of the cases continue to speak of a 'substantial part' or 'substantial portion', when they are viewed as an entirety it is apparent that the activities must properly be tested as to what they accomplish rather than how much time they may consume. * * * " Yellow Transit Freight Lines, Inc. v. Balven, C. A. 8th (1963), 320 F.2d 495, 498 [1].

■ The Court, accordingly, finds and concludes that the duties of each of the respective employees of the defendant named in the respective eight counts of the information filed herein substantially affected motor vehicle safety and so each of them, respectively, was permitted and required by the defendant to operate motor vehicles in interstate commerce while remaining on duty for a total of more than 70 hours in a period of eight consecutive days.

■ The defendant further contends that it did not willfully and knowingly commit the alleged violations of the aforesaid regulations, which had been revised without its knowledge. It is stipu-

---

2. This decision undermines the former rule that the regulation applied only when the driver was engaged in the activities contemplated by the regulation for a substantial amount of time. Cf. Walling v. West Kentucky Coal Co., D.C.Tenn. (1944), 60

F.Supp. 681, 690 [11], affirmed C.A. 6th (1946), sub nom. West Kentucky Coal Co. v. Walling, 153 F.2d 582, see p. 586 [9]; Fletcher v. Grinnell Bros., C.A.6th (1945), 150 F.2d 337.

lated[3] that the attention of the defendant's personnel was directed to the ICC regulations by investigators in 1960 and 1962 and that the defendant engaged in correspondence with district Interstate Commerce Commission authorities for a period, commencing March 7, 1941 and extending through June 12, 1962 regarding the defendant's non-compliance with the pertinent ICC regulations. It is reasonably inferable from these stipulated facts (a) that the defendant's officials were cognizant of the fact that the defendant corporation was amenable to ICC regulations, (b) that these officials were aware that the corporation was not in full compliance at all times with those regulations, and (c) that, therefore, whatever the corporation required and permitted its drivers to do was done willfully and knowingly by the defendant.

The Court finds and concludes further that there is no merit to the defendant's contention that the charges in counts 3 and 4, on the one hand, and 5 and 7, on another, amount to double jeopardy. The criminal conduct alleged in these four respective counts is that of the defendant in relation to its respective drivers, i. e., no one of its drivers was to be permitted by the defendant to drive over the maximum number of hours in any eight-day period. The respective periods of violation concerning the driving of Whittemore charged in counts 3 and 4, and concerning that of Duggin in counts 5 and 7, were different eight-day periods.

The Court finds and concludes further that the defendant's interstate operations constitute interstate commerce, and that the defendant is not exempted in any wise from the operation of the aforesaid regulation. See amendment, effective September 5, 1962, to 49 C.F.R. 195.3.

It is adjudged that the defendant corporation pay a fine to the United States in the sum of $100.00 on each of counts 1, 2, 3, 4, 5, 6, 7, and 8 of the information herein, an aggregate sum of $800.00.

---

3. The defendant stitpulated that this evidence is factually correct but objects to its competency. The objection hereby is overruled; the evidence is competent for the purposes indicated.